IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KUMIKO BURKE, et al. | ) | Civ. No. 08-00339 BMK |
| | ) | |
| Plaintiffs, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| CITY AND COUNTY OF | ) | |
| HONOLULU, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Butch Burke ("Burke") and his wife Kumiko Burke

("Kumiko") filed this action against Defendants City and County ("the City") of

Honolulu and Honolulu Police Department ("HPD") police officer Clement Enoka,

III.[1]  This case arises out of a search and seizure that was conducted at Plaintiffs'

pawn shop, Holo Holo Pawn Shop ("HHPS"), during which more than 1,700 items

were seized.  Plaintiffs contend that the search and seizure violated their

constitutional rights under the Fourth Amendment to the United States

Constitution.  Plaintiffs also claim Defendants are liable for assault, defamation,

intentional infliction of emotional distress ("IIED"), negligence, and harassment.

---

[1] HPD was also named as a Defendant in the Complaint, but this Court previously
dismissed HPD from the case.

After careful consideration of the evidence and arguments of counsel, the Court concludes that the City is liable for violating Plaintiffs' constitutional rights.  Therefore, Plaintiffs are awarded damages against the City in the amount of $39,458.  The Court also concludes that Defendants prevail on all other claims.

FACTS

In 2007, HPD noticed a sharp increase in the number of unauthorized entries into motor vehicles in the Waikiki area, which is located in HPD's District 6.  HPD officer Grant Jhun is assigned to District 6 and learned from a confidential source that items stolen from the vehicles were being sold to Burke at HHPS.  Based on that information, HPD conducted an undercover investigation in which officer Stephen Forman befriended Burke at the pawn shop.  Eventually, Forman sold prerecorded jewelry that he described as stolen goods to Burke on July 30 and July 31, 2007.  During each sale, Burke did not request identification or a thumb-print from Forman, nor did Burke fill out a pawn slip or other paperwork.

HPD's District 6 requested Enoka's assistance in the pawn shop investigation.  At the time, Enoka was assigned to District 7, but had experience with prior pawn shop investigations, as he had been the case agent for the investigation of Ziggy's Pawn Gold and Diamond Buyers ("Ziggy's") and assisted

in the investigation of Local Pawn.  Enoka's supervisor, Gilbert Kilantang,

approved the request for Enoka to assist in the HHPS investigation.

Based upon the evidence gathered during the undercover operation,

Enoka prepared an affidavit in support of a search warrant for HHPS on August 3,

2007.  State Judge Barbara Richardson reviewed and approved the search warrant

that day.  The search warrant authorized the search of HHPS for sixteen items of

jewelry that officer Forman sold to Burke during the undercover operation, as well

as for:

> Articles of personal property tending to establish the
> identity of persons in control of the premises, property
> and/or silver, gold, and jewelry items, consisting of, and
> including but not limited to personal identification, bills,
> bank account statements, checks, photographs, rental
> receipts, rental agreements, keys and documents tending
> to establish ownership of the premises.

(Ex. 21.)

Later that evening, on August 3, 2007, the search warrant was

executed at HHPS.  Members of the Specialized Services Division ("SSD") of

HPD made entry at 8:19 p.m. and secured HHPS within four minutes.  Officer

Michael Miranda was the SSD entry sergeant that night.  He testified that only one

officer was carrying a rifle, the other officers were carrying handguns, and that

none of the officers pointed any guns at Burke or Richard McKinney, who was

also present at HHPS when SSD made entry.  According to Burke and McKinney, however, SSD officers pointed guns at them and threatened to shoot Burke.

After SSD officers secured HHPS, the other police officers, including Enoka entered the pawn shop.  Enoka informed Burke that he was being arrested for three counts of attempted theft in the second degree.  Enoka permitted Burke to call his wife and a police officer friend.  He also let Burke use the bathroom and get a jacket to keep warm.  Enoka also allowed Burke to keep an envelope containing $9,000 that was found in a safe so that he could post bail.  Burke was then escorted off the premises and taken to jail.

Jhun found three of the items listed in the search warrant in a back room at HHPS.  He testified that those items were found commingled with legitimate items for sale.  Based on previous pawn shop seizures and Enoka's discussions with deputy prosecuting attorney Charlotte Duarte, Jhun understood that all items in the pawn shop could be seized if the stolen items were found commingled with legitimate items for sale.  Jhun's supervisor, as well as Enoka and Enoka's supervisor, had the same understanding.  After Jhun informed his

supervisor and Enoka that commingled items were found, the decision was made to seize everything in the pawn shop.[2]  More than 1,700 items were seized by HPD.

The next day, on August 4, 2007, while still in police custody, Burke was taken to Queen's Medical Center because he was complaining of chest pain. After undergoing a few tests and learning that he was being released from custody, Burke suddenly "indicated he felt better, he was chest-pain-free and wished to sign out against medical advice."  (Ex. 1.)

Two days later, on August 6, 2007, Burke was taken to Kuakini Medical Center's emergency room complaining of chest pain, shortness of breath, and irregular heartbeat.  After receiving some medication, Burke again signed out of the hospital "against medical advice."  (Ex. 2.)

Burke and Kumiko testified they saw news coverage of the pawn shop search and seizure on television and online.  The news coverage was embarrassing for them.  They say Burke's picture was shown on the news and, as a result, their lease for the HHPS premises was terminated and they were forced to move out within thirty days.  Additionally, HHPS and Holo Holo Auto ("HHA"), a used car

---

[2] As noted below, there was conflicting testimony at trial regarding who made the final decision to seize everything at HHPS.  Some of the evidence suggests that Enoka made the final decision even though he was no longer at HHPS when the decision was made; other evidence suggests the decision was made by someone else.

business operated by Plaintiffs out of the pawn shop, were closed for business because the lease was terminated.

Burke was not indicted for any crime arising from the August 3, 2007 search and seizure.

In 2009, seized items were returned to Burke.  According to Burke, many of the items depreciated in value by 20-25%, for a total of $30,756.  He also testified that some items were not returned or were returned damaged.  He values the loss for those items at $111,380.  Burke also testified that he incurred damages due to the closure of HHPS and HHA.

On July 23, 2008, Plaintiffs filed this action.  In their Complaint, they assert the following claims against Defendants:  (1) conspiracy to violate constitutional rights under 42 U.S.C. § 1983 (Count 1); (2) wrongful search and seizure (Count 2); (3) deprivation of civil and property rights (Count 3); (4) assault (Count 4); (5) defamation (Count 5); (6) IIED (Count 6); (7) negligence (Count 7); (8) harassment (Count 8); (9) punitive damages (Count 12); and (10) injunctive relief (Count 13).[3]

---

[3] The Court notes that the Complaint does not include Counts 9, 10 or 11.

On December 23, 2009, Defendants moved for summary judgment on each claim against them.  The Court granted in part and denied in part the summary judgment motions.  (See Summary Judgment Order dated June 9, 2010; Doc. 226.) After dismissing HPD as a Defendant, as well as certain claims, the following Counts proceeded to trial:  Count 2 for wrongful search and seizure, Count 4 for assault, Count 6 for IIED, Count 7 for negligence, Count 8 for harassment, and Count 12 against Enoka for punitive damages.

A bench trial was held on June 1-3, 2010, June 23, 2010, and July 19, 2010.

## DISCUSSION

I.          Wrongful Search and Seizure under 42 U.S.C. § 1983

In Count 2, Plaintiffs allege that the search warrant was executed in an overbroad way and that "the search and seizure purportedly made under the search warrant was wrongful, unconstitutional, and violated the specific requirements for search warrants."  (Complaint ¶ 96.)  As discussed in detail below, the Court concludes that the City violated Plaintiffs' rights under the Fourth Amendment, but that Enoka is qualifiedly immune from liability as to this claim.

A.      Claim for Wrongful Search and Seizure Against the City

1.      Whether the City Has a "Policy" for Purposes of § 1983

Municipal liability under 42 U.S.C. § 1983 "can only be imposed for injuries inflicted pursuant to an official government policy or custom." Davis v. City of Ellensburg, 869 F.2d 1230, 1233 (9th Cir. 1989). A "policy" is a "deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Young v. City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009). "A 'custom' for purposes of municipal liability is a 'widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." Id.

"Absent a formal governmental policy, [Plaintiffs] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). The policy or custom "must be so persistent and widespread that it constitutes a permanent and well settled city policy." Id. Liability for improper policy or custom "may not be predicated on isolated or sporadic incidents; it must

8

be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  Id.

Plaintiffs assert that an informal policy was established between HPD and the prosecutor's office regarding the execution of search warrants and the seizure of items at pawn shops.  According to deputy prosecuting attorney Charlotte Duarte, this alleged policy, discussed below, is based on Hawaii's asset forfeiture laws found in chapter 712A of the Hawaii Revised Statutes. Specifically, § 712A-6 authorizes the seizure of personal property "without court process" where an officer "has probable cause to believe that the property is subject to forfeiture."  Haw. Rev. Stat. § 712A-6(a)(c)(iv).  Section 712A-5 lists property that is subject to forfeiture, including "[p]roperty used or intended for use in the commission of, attempt to commit, or conspiracy to commit a covered offense, or which facilitated or assisted such activity."  Haw. Rev. Stat. § 712A-5(1)(b).   Theft is one of the covered offenses.  Haw. Rev. Stat. § 712A-4(b).  As applied to this case, these statutes authorize the seizure of property without court process where an officer has probable cause to believe that the property is used in or facilitates the commission of theft.

Deputy prosecuting attorney Duarte discussed at trial how the prosecutor's office and HPD have worked together regarding the execution of

search warrants and asset forfeitures at pawn shops.  Duarte has been handling civil

asset forfeiture cases for the prosecutor's office since 1989 and is the only deputy

prosecutor who handles such cases.  She testified that, beginning with the first

pawn shop search and seizure, she met with police officers to determine "what the

[Hawaii asset forfeiture laws] would require of them and me, and what kinds of

procedures should be followed to satisfy the requirements of the statute."

According to Duarte, she and HPD officers "developed a standard operating

procedure" for searches and seizures at pawn shops.  Duarte agreed that, "over six

or seven years, there's been four pawn shop investigations where this same

longstanding procedure has been followed."  In each case, a search warrant was

obtained to search the pawn shops for specific items, yet all assets of the pawn

shop were seized, including the "pawn shop business, in its entirety, [and] its

inventory," because stolen items were found commingled with legitimate items for

sale.  This "standard operating procedure" is what Plaintiffs claim to be the City

policy that violated their rights.

Duarte explained the reasoning of this "standard operating

procedure," which allows officers to seize all assets of a pawn shop even though

the search warrant enumerates only specific items.  Duarte testified that, when

stolen property is purchased by a pawn shop, the pawn shop itself becomes a

facilitating instrument, which conceals criminal activity.  In essence, the pawn shop becomes an instrumentality used to facilitate the commission of criminal offenses, such as theft.  Duarte testified that, under Hawaii's asset forfeiture laws, HPD may seize for forfeiture the instrumentality – in this case, the pawn shop – that facilitates the commission of a criminal offense.  Thus, all assets of the pawn shop, including items not listed in the search warrant, may be seized by the police when stolen items are found commingled with legitimate items, without obtaining another search warrant for those legitimate items.

According to Duarte, this "standard operating procedure" was utilized in four pawn shop investigations:  A-1 Pawn, Local Pawn, Ziggy's, and HHPS. She stated that, in each case, "all assets of the pawn shops were seized" and that the police "did the same thing in every case."  She also testified that the standard operating procedure "worked very well in all of these cases."  In the case of A-1 Pawn, the shop owners "basically conceded and walked away from the case."  In Local Pawn and Ziggy's, the prosecutor's office reached a settlement with the pawn shop owners.

Importantly, Duarte also testified that then-Prosecuting Attorney, Peter Carlisle, ratified this standard operating procedure and delegated or gave authority to Duarte to work with HPD regarding the procedure.  She also stated

that Carlisle had policymaking authority at the prosecutor's office regarding asset

forfeiture while he was the Prosecuting Attorney.

Duarte's discussion of what she termed the "standard operating

procedure" regarding pawn shop searches and seizures establishes that it meets the

criteria of a municipal "policy" for purposes of § 1983.  Trevino, 99 F.3d at 918

("Absent a formal governmental policy, [a plaintiff] must show a 'longstanding

practice or custom which constitutes the standard operating procedure of the local

government entity.'").  According to Duarte, the procedure has been in effect for

six or seven years and has been used identically in all four pawn shop cases.  The

procedure was deliberately created and was based on conferrals between the

prosecutor's office and police officers in an attempt to comply with Hawaii's asset

forfeiture laws.  Carlisle, who had policymaking authority, ratified the procedure.

Young, 687 F. Supp. 2d at 1147 (a "policy" is a "deliberate choice to follow a

course of action made from among various alternatives by the official or officials

responsible for establishing final policy with respect to the subject matter in

question").  Based on Duarte's testimony, this procedure constitutes "a permanent

and well settled city policy" for purposes of § 1983.  Trevino, 99 F.3d at 918.

The Court notes that Duarte was twice called by Defendants to testify at trial[4] and that her testimony changed significantly the second time she was on the witness stand.  Duarte first testified that there was a "standard operating procedure" that was "longstanding" for six or seven years, was utilized the same way in every pawn shop search and seizure, and was ratified by Carlisle who had final policymaking authority at the time.  However, the second time she testified, Duarte stated that the prosecutor's office has no policy, custom, or practice related to asset forfeitures of pawn shops.  Contrary to her earlier testimony that the "standard operating procedure" was carried out the same way at all pawn shop searches, Duarte testified on July 19, 2010 that the procedure was "evolving."  She also changed her testimony as to Carlisle's ratification of the procedure, stating in her later testimony that she never informed him of the standard operating procedure.  The Court questions Duarte's change in testimony and finds her more recent statements less credible.  Based on Duarte's earlier testimony, the Court concludes that the City's "standard operating procedure" is a "policy" under § 1983.

---

[4] Duarte testified on June 3, 2010 and July 19, 2010.

2.      Whether the City's Policy Violated Burke's
Constitutional Rights

Next, the Court must determine whether the City's policy violated

Burke's constitutional rights under the Fourth Amendment.  As explained below,

the Court concludes that Hawaii's asset forfeiture laws did not authorize the

seizure of items not listed in the search warrant and that the City's policy therefore

violated Burke's Fourth Amendment rights.

Hawaii's asset forfeiture laws were addressed by the Hawaii Supreme

Court in Kaneshiro v. $19,050 in United States Currency, 73 Haw. 229, 832

P.2d 256 (Haw. 1992).  In that case, an inspector at the airport opened a federal

express package and found a heat-sealed plastic bag, which contained a whiskey

bag, peppercorns, and $19,050 in cash.  Id. at 230-31, 832 P.2d at 257.  Although a

dog "alerted" to the presence of illegal substances, no illegal drugs were found.  Id.

at 231, 832 P.2d at 257.  The cash was seized, and the trial court found probable

cause based on the dog's alert.  Id. at 233, 832 P.2d at 258.

On appeal, the Hawaii Supreme Court interpreted Hawaii's asset

forfeiture laws narrowly.  It held there was no evidence to support a finding of

probable cause that the package was related to the offense of promoting a

dangerous drug.  The court stated:

14

> According to the trial court, the covered offense committed in this case was "promoting a dangerous, harmful, or detrimental drug" under HRS § 712A-4. However, the evidence required to support such a conclusion is practically non-existent where the State could not prove the presence of any illegal drugs, but could only offer a "scent" of illegal drugs.
>
> . . . .
>
> Here, while the manner in which the money was packaged and shipped may have been suspicious, even combined with the results of the dog sniff test, <u>the State did not present sufficient evidence to support a finding that a covered offense had been committed or even attempted, nor to support a finding of probable cause for the seizure</u>.

<u>Id.</u> at 234, 832 P.2d at 259 (citations omitted) (emphasis added).  Because the officers lacked probable cause to seize the cash, the court ruled that the cash should be returned to its rightful owner.  <u>Id.</u>

Similarly, in this case, the HPD officers lacked probable cause to believe the legitimate items seized were used in or facilitated the commission of theft.  Haw. Rev. Stat. § 712A-6 authorizes a seizure without court process only if probable cause exists.  Probable cause is defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'"  <u>United States v. Thornton</u>, 710 F.2d 513, 515 (9th Cir. 1983).  The probable cause that HPD relied on was the mere fact that three items listed in the search warrant were found commingled with legitimate items.

Other than the items being commingled, there was no other reason for believing the legitimate items were related in any way to theft.  The lone fact that items were commingled is insufficient to warrant a prudent person in believing that the legitimate items were used in or facilitated the commission of theft.  See id.  As in Kaneshiro, the City does "not present sufficient evidence to support a finding that a covered offense had been committed or even attempted, nor to support a finding of probable cause for the seizure" of items not listed in the warrant.  73 Haw. at 234, 832 P.2d at 259.

Moreover, Defendants' position during trial was that the entire pawn shop business was a criminal enterprise, which allowed for the seizure of all items found therein.  However, under Kaneshiro, Hawaii's asset forfeiture laws are construed narrowly and authorize the seizure of property that is used or intended for use in the commission of a "covered offense."  Haw. Rev. Stat. § 712A-5(1)(b). The "covered offenses" are listed in § 712A-4 and do not include criminal enterprises.  Thus, because a criminal enterprise is not a covered offense for which property may be seized without court process, Hawaii's asset forfeiture laws did not authorize the seizure of items not listed in the search warrant.

Accordingly, Haw. Rev. Stat. § 712A-6(a)(c)(iv) is not applicable and did not authorize the seizure of legitimate items "without court process."  HPD's

seizure of items not listed in the search warrant was not authorized by law.

Consequently, HPD's actions that were based on the City's policy regarding asset

forfeitures at pawn shops violated Burke's Fourth Amendment rights.  See United

States v. Ruckes, 586 F.3d 713, 716-17 (9th Cir. 2009) ("Subject only to a few

specifically established and well-delineated exceptions, a search is presumed to be

unreasonable under the Fourth Amendment if it is not supported by probable cause

and conducted pursuant to a valid search warrant.").  Thus, the Court concludes

that the City is liable for damages caused by its policy.  Davis, 869 F.2d at 1233.

> B.      Claim for Wrongful Search and Seizure Against Enoka

In his motion for summary judgment, Enoka asserted the defense of

qualified immunity.  As detailed below, the Court concludes that Enoka is

qualifiedly immune from liability as to the § 1983 claim.

Qualified immunity "protects § 1983 defendants from liability for

civil damages when performing discretionary functions, unless such conduct

violates a clearly established constitutional or statutory right of which a reasonable

person would have known."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th

Cir. 2001).  The standard for a qualified immunity analysis is as follows:

> After Saucier, a qualified immunity analysis must begin
> with this threshold question:  based upon the facts taken
> in the light most favorable to the party asserting the

17

> injury, did the officer's conduct violate a constitutional right? If no constitutional right was violated, the court need not inquire further. If, however, a constitutional violation occurred, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right.

Id.

Under the first prong of this test, the Court must determine whether Enoka's conduct violated Burke's Fourth Amendment rights. As discussed above, Enoka's decision to seize all items at HHPS violated Burke's Fourth Amendment rights because the search warrant did not authorize seizure of items not listed in the warrant.[5] The first prong of the qualified immunity test is therefore met.

Under the second prong of the qualified immunity test, the Court must determine whether Enoka "reasonably but mistakenly believed that his . . . conduct did not violate a clearly established constitutional right." Jackson, 268 F.3d at 651. The Court concludes that he did reasonably but mistakenly believe his actions were constitutional.

---

[5] For purposes of this analysis, the Court assumes that Enoka made the decision to seize all items in HHPS on August 3, 2007. The Court notes there was conflicting testimony at trial regarding who made the final decision to seize everything at HHPS. Some of the evidence suggests that Enoka made that decision, while other evidence suggests the decision was made by someone else. The Court assumes the decision was made by Enoka because, as discussed below, Enoka is nevertheless qualifiedly immune from making that decision.

According to deputy prosecutor Duarte, she conferred with Enoka about all four pawn shop cases in which the "standard operating procedure" was used.  All four pawn shop searches and seizures were conducted using this procedure.  Although the issue of whether the procedure violated the pawn shop owners' constitutional rights was raised in some of the other cases, Enoka was never made aware of that.  As far as he knew, based on his consultations with Duarte, his compliance with the procedure meant that he was acting within the confines of the law.  Enoka even consulted with Duarte a few times on the day of the HHPS seizure and believed, based on those consultations, that the decision to seize everything was proper.

Moreover, Jhun, Jhun's supervisor, and even Enoka's supervisor understood that legitimate items could be seized if found commingled with stolen items listed in the search warrant.  Jhun was the case agent for the search of HHPS and testified that he briefed the officers prior to the search and seizure and told them that, if stolen items were found commingled with legitimate items, "we would take everything in the store."  Jhun's supervisor, Vernon Bunch, similarly testified that his "understanding was that if [stolen items] . . . were commingled with regular items within the pawn shop, that the forfeiture law would give us the permission to take all the property."  Similarly, Enoka's supervisor, Gilbert

19

Kilantang, stated that he had the same understanding – that is, legitimate items could be seized if found commingled with stolen items because "they were part of a criminal enterprise."

In summary, Enoka made the decision to seize all items based on: Duarte's advice, the City's policy on pawn shop seizures, his own experience handing similar investigations, the four prior pawn shop seizures, and information from Jhun that stolen items were in fact found commingled with legitimate items. Deputy prosecutor Duarte believed Enoka's decision was in full compliance with the law. Moreover, Jhun, his supervisor and Enoka's supervisor believed that Enoka's decision was proper. Accordingly, based on the testimony at trial, the Court concludes that Enoka "reasonably but mistakenly believed that his . . . conduct did not violate a clearly established constitutional right." Jackson, 268 F.3d at 651. Enoka is therefore qualifiedly immune from the § 1983 claim.

II.        State Law Claims for Assault, Harassment, IIED, and Negligence

In their Complaint, Plaintiffs assert claims for assault (Count 4), IIED (Count 6), negligence (Count 7) and harassment (Count 8). In his motion for summary judgment, Enoka asserted the "qualified or conditional privilege" under Hawaii law with respect to these claims. This qualified privilege "allows the action to proceed but limits liability to only the most guilty of officials by holding

20

plaintiffs to a higher standard of proof than in normal tort cases." <u>Bartolome v.</u>

<u>Kashimoto</u>, Civ. No. 06-00176 BMK, 2009 WL 1956278, at *1 (June 26, 2009)

(quoting <u>Medeiros v. Kondo</u>, 55 Haw. 499, 522 P.2d 1269, 1272 (Haw. 1974)).  To

overcome qualified privilege, "a plaintiff must prove by clear and convincing

evidence that an official was 'motivated by malice and not by an otherwise proper

purpose.'"  <u>Id.</u>

   For claims other than defamation, courts employ an "actual malice"

test.  <u>Id.</u>  Under this test, "malice is defined as 'the intent, without justification or

excuse to commit a wrongful act,' 'reckless disregard of the law or of a person's

legal rights,' and 'ill will; wickedness of heart.'"  <u>Id.</u> at *2.  The Hawaii Supreme

Court has held that "the qualified privilege had not been overcome where there was

no 'evidence that any of the defendants' actions were motivated by ill will or an

intention to commit, or a reckless disregard of committing, a wrongful act against

any of the plaintiffs.'"  <u>Id.</u>

   As discussed below, the Court concludes that qualified privilege

shields Enoka from liability for each of the state law claims, which in turn protects

the City from being liable through respondeat superior.  <u>See</u> <u>Reed v. City &</u>

<u>County of Honolulu</u>, 76 Haw. 219, 228, 873 P.2d 98, 107 (Haw. 1994) ("under the

doctrine of respondeat superior, . . . if an employee is immune from suit, then the employer is also immune from suit and cannot be held liable").

> A.     Assault (Count 4) and Harassment (Count 8)

In Count 4 of the Complaint, Plaintiffs assert a claim for assault, alleging that Enoka and the SSD entry team "combined and conspired to violate [Burke's] statutory civil rights by acting in concert to intimidate him by placing a loaded rifle against his forehead and threatening to shoot him if he moved." (Complaint ¶ 110.)  In Count 8, Plaintiffs assert a claim for harassment, which states in full:

> 124.   All of the allegations of paragraph 1 through 123 hereof are hereby incorporated by this reference into this COUNT VIII.
> 125.   Some or all of the actions described above in this COMPLAINT constituted unlawful harassment.

(Id. ¶¶ 124-25.)  Although the Complaint does not specify which facts support the harassment claim, Plaintiffs' Trial Brief states that "Enoka and HPD's act of aiming and/or placing guns to Mr. Burke's head and threatening to shoot him if he moved" supports the assault and harassment claims.  Thus, the Court addresses both claims together.

With respect to whether police officers held guns to Burke's head and threatened to shoot him if he moved, Burke testified at trial that officers entered

HHPS and held rifles and pistols at his head.  Richard McKinney, who was in the pawn shop at the time, similarly testified that police officers pointed guns at him and Burke, and that he saw a police officer, who had a gun pointed at Burke, spin the gun into and out of his holster.

In contrast to Burke's and McKinney's testimony, Michael Miranda, who was the sergeant for the SSD entry team and has had extensive training on use-of-force, testified that none of the officers pointed guns at Burke or threatened to shoot him.  He testified that all of the officers had their weapons pointing down toward the ground the entire time and that he did not see any officer point weapons at the head or body of any person.   Further, he stated that none of the officers would spin a gun into and out of his holster and that doing so would warrant being kicked out of SSD.  He also testified that none of the officers would threaten to shoot Burke or anyone else.

The Court finds Miranda's testimony more credible than Burke's and McKinney's testimony.  Miranda has worked at HPD for 26 years, has gone through training on SSD procedures, and was the entry sergeant for the execution of the search warrant.  Significantly, Miranda's testimony was consistent during both direct and cross examination that SSD followed standard operating procedures during the search of HHPS.  His testimony was not impeached.  The

Court finds credible Miranda's testimony that he did not see any officer point a

gun at Burke or threaten to shoot him.  Based on Miranda's testimony, the Court

finds that none of the officers pointed guns at Burke or threatened to shoot him.

Moreover, Plaintiffs fail to show that any of Enoka's or the other

officers' actions were done with malice.  According to Burke, after Enoka told him

he was being placed under arrest, Enoka allowed Burke to take an envelope

containing $9,000 from one of the safes so he could post bail.  Burke also testified

that Enoka allowed him to use the telephone so he could call his wife and a police

officer friend.  Enoka's testimony confirmed that he allowed Burke to call his wife

and a friend, and that he allowed Burke to take the envelope that had money in it.

Enoka also testified that he permitted Burke to use the restroom and to get a jacket

so he could keep warm.  None of the evidence before the Court suggests that

Enoka or the other officers acted with malice or ill will.  See Bartolome, 2009 WL

1956278, at *2.  Therefore, even if Enoka's or the other officers' actions

constituted assault or harassment, they would be protected by qualified privilege.

Id.

Accordingly, because the Court finds that none of the officers pointed

guns at Burke or threatened to shot him and because the officers would

nevertheless be protected by qualified privilege, the Court concludes that neither

Enoka nor the City is liable for assault or harassment.  See Reed, 76 Haw. at 228,

873 P.2d at 107.

> B.     IIED (Count 6)

In Count 6 of the Complaint, Plaintiffs assert a claim for IIED.  They

allege that Enoka and other HPD officers "intentionally abused [Burke's]

constitutional rights in a manner that was extreme, outrageous, and unjustified, and

caused [him] to suffer extreme emotional distress."  (Complaint ¶ 118.)  In their

Trial Brief, Plaintiffs allege the factual bases of this claim:  (1) Enoka's and other

officers' "intentional act of aiming and/or placing guns to [Burke's] head and

threatening to shoot him if he moved," (2) "Defendants' overbroad and excessive

search and seizure," and (3) Defendants' "failure to return [Burke's] items from the

unlawful search and seizure for almost two years."  (Plaintiffs' Brief at 48.)

As discussed above, the Court finds that none of the HPD officers

pointed guns at Burke's head or threatened to shoot him.

Regarding the search and seizure, the Court agrees that the City

violated Burke's constitutional rights by seizing items that were not listed in the

search warrant.  However, Burke presented no evidence at trial showing that this

was "motivated by ill will or an intention to commit, or a reckless disregard of

committing, a wrongful act against any of the plaintiffs."  Bartolome, 2009 WL

1956278, at *2.  Indeed, Enoka and the other officers were simply carrying out the City policy concerning pawn shop seizures that had been in effect for years. Further, as discussed in the Summary Judgment Order, the search warrant was supported by probable cause.  (Summary Judgment Order at 10.)  Absent any evidence showing that the search and seizure was motivated by malice, the Court rules in Enoka's favor on this issue.

Finally, no evidence was presented at trial showing why items seized during the search were not returned for nearly two years.  At trial, Burke testified that items were not returned to him until 2009 and he also discussed the value of those items for damages purposes, but no evidence revealed that the City's decision to retain the items was motivated by malice or ill will.  Qualified privilege therefore shields Enoka's liability on this issue as well.

Insofar as the Court rules in Enoka's favor on the IIED claim, the City is not liable for this claim under respondeat superior.  See Reed, 76 Haw. at 228, 873 P.2d at 107.

C.     Negligence (Count 7)

In Plaintiffs' Complaint, they assert a claim for negligence in Count 7. The entirety of that Count states:

> 122. All of the allegations of paragraph 1 through 121 hereof are hereby incorporated by this reference into this COUNT VII.
>
> 123. Some of the actions undertaken by the HPD constituted negligence.

(Complaint ¶¶ 122-23.)

As discussed above, Enoka asserts Hawaii's qualified privilege with respect to this claim, and Plaintiffs must prove that Enoka was "motivated by malice and not by an otherwise proper purpose." Bartolome, 2009 WL 1956278, at *1. In the context of negligence claims, however, this Court previously held that "a non-judicial official's qualified privilege provides complete immunity from negligence claims." Id. at *2. This Court reasoned:

> To overcome a non-judicial official's qualified privilege, . . . requires a showing that the official was "motivated by ill will or an intention to commit, or a reckless disregard of committing, a wrongful act." As a matter of law, the Court finds that such a showing is incompatible with a claim based on negligence. The level of intent required to demonstrate malice removes the alleged injurious action from the realm of negligence into that of intentionally tortious conduct. Thus, . . . a non-judicial official's qualified privilege provides complete immunity from negligence claims. This is in conformity with the public policy underlying the privilege that "only the most guilty of officials" should be subject to tort liability for their actions.

Id. (citations omitted).

As applied to this case, Enoka's assertion of qualified privilege under Hawaii law "provides complete immunity from negligence claims." Id. The Court therefore rules in Enoka's and the City's favor on Count 7 for negligence. See Reed, 76 Haw. at 228, 873 P.2d at 107.

        D.      Summary of State Law Claims

For the reasons discussed above, the Court concludes that neither Enoka nor the City is liable for any of the state law claims asserted by Plaintiffs.

III.        Punitive Damages Against Enoka

Under Hawaii law, "[i]n order to recover punitive damages, 'the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." Mullaney v. Hilton Hotels Corp., 634 F. Supp. 2d 1130, 1153 (D. Haw. 2009) (quoting Ass'n of Apartment Owners v. Venture 15, Inc., 115 Haw. 232, 297, 167 P.3d 225, 290 (Haw. 2007)).

Plaintiffs' claim for punitive damages is directed only against Enoka. As discussed above, however, the Court concludes that Enoka is not liable in this

case.  Consequently, Plaintiffs have failed to establish that they may recover any damages, including punitive damages, from Enoka.

IV.          Damages Against the City

Plaintiffs seek to recover compensation from the City for damage to (1) HHA, (2) HHPS, and (3) Plaintiffs' reputation, as well as for (4) emotional and physical damages.  (Plaintiffs' Brief at 50-55.)

"A plaintiff who establishes liability under 42 U.S.C. § 1983 is entitled to recover for all compensatory damages suffered, including actual expenditures and economic harm, pain and suffering, and mental anguish and humiliation."  Knapps v. City of Oakland, 647 F. Supp. 2d 1129, 1169 (N.D. Cal. 2009) (citing Borunda v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1988)).

A.     Holo Holo Auto

HHA was owned and operated by Plaintiffs out of the pawn shop to sell used cars to the public on time contracts.  (Plaintiffs' Brief at 50.)  Plaintiffs contend that the business records of HHA were among the items seized on August 3, 2007 and that HHA stopped doing business thereafter because it could not operate without its business records.  (Ex. 55 at 4.)  Plaintiffs argue that the total damage to HHA from the seizure is $2,236,872.00.  (Plaintiffs' Brief at 51.)

29

Plaintiffs retained accountant Eddy N. Kemp to estimate the losses incurred from the interruption of HHA stemming from the August 3, 2007 seizure. Kemp determined that Burke is entitled to approximately $1,270,000 in outstanding receivables, as well as $964,872 in lost income from future business. With respect to "the loss of income from future business," Kemp used "the average of years 2004 and 2005 as indicative of the operations of Holo Holo Auto were it not for the interruption of HPD" and estimated that Burke would have had a "net income of $964,872 or approximately $1 million lost by Mr. Burke over the 23 month period for which damages are being estimated."

Contrary to Kemp's estimation, Defendants' expert, economist Thomas A. Loudat, opined that HHA suffered no loss due to the seizure.  In support of his opinion, Loudat testified that the "tax returns . . . indicate that the company never made any profit."  Loudat opined that HHA would not be profitable until 2028 and that it would lose millions of dollars until 2028.

Importantly, Loudat opined that "other factors also were indicative of a company that was going to have incredible financial difficulties moving forward in time due to events totally unrelated to the HPD event of August of '07."  For

example, Loudat referred to the <u>Kim</u> lawsuit[6] and criticized Kemp for failing to

"provide a lot of detail related to it, and he didn't factor in anything in his analysis

related to that lawsuit."  According to Loudat, "immediately after the

commencement of that lawsuit, . . . you see a significant drop off in the sales of the

company."  Loudat also discussed the "general economic conditions that were

occurring at that time" in the auto sector.  Loudat explained that the economic

conditions of the auto industry "turned significantly negative . . . commencing in

'06 and carrying through to the lowest auto sales in 27 years in 2009."  Because the

"sales of the industry [and] sales of [HHA] move in almost perfect lockstep,"

Loudat explained that "the expectation or the forecast would be based on that

relationship, that if the industry goes down, so would go the sales of Holo Holo

Auto, which is exactly what happened."

Loudat also criticized Kemp's reports, testifying that Kemp "didn't

meet the standards of the profession or those specified, by law, in Hawaii, with

respect to documenting assertions, assumptions, et cetera, that he made."  Loudat

found "methodological errors as well in his analysis."  Loudat also pointed out that

---

[6] In <u>Yeon Ho Kim v. Butch Burke</u>, et al., Civil No. 06-1-1489-08 SSM, Yeon Ho Kim
sued Burke over HHA in Hawaii state court.  In September 2006, the state court issued an
injunction prohibiting Burke from transferring, selling, or otherwise disposing of HHA property.
(Ex. 507.)  That injunction was modified by a stipulated order the next month, which allowed
Burke to collect receivables for HHA and turn them over to a receiver.  (Ex. 508.)

Kemp's "loss amounts are expressed in pretax terms" because Kemp failed to "take

out any taxes due to income taxes or Social Security, [or] Medicare taxes which all

come out."  According to Loudat, this may be explained by the fact that

"accountants don't have the same level of training as an economist."

       The Court agrees with Loudat's projections and opinions that HHA

suffered no economic damages from the August 3, 2007 seizure.  Regarding

outstanding receivables, the <u>Kim</u> lawsuit allowed Burke to collect receivables of

HHA.  However, there is no evidence that Burke would have in fact collected those

receivables after the seizure occurred.  Regarding the loss future income of HHA,

the Court finds persuasive Loudat's reasoning that the company's tax returns did

not show positive net income for the year prior to the search.  Further, the Court

agrees with Loudat that HHA would have been negatively impacted by the

worsening economic conditions of the auto industry, which started in 2006 and

significantly worsened by 2009.  In light of HHA's profit history and the

downward economic trend affecting the auto industry at the time of the seizure, the

Court concludes that the company did not suffer any loss due to the August 2007

seizure.  Accordingly, Plaintiffs are entitled to no damages as to HHA.

B.      Holo Holo Pawn Shop

With respect to damages as to HHPS, Plaintiffs ask for $30,756 for depreciation of returned items (Ex. 81), $111,380 for unreturned and damaged property (Ex. 82), $20,149.68 for expenses incurred by the closure of the pawn shop, and $400,000 for a private loan taken out by Plaintiffs.  (Plaintiffs' Brief at 53.)

1.      Returned Property

Plaintiffs seek $30,756 for the depreciation of seized items that were later returned to them.  In support of that amount, Burke prepared a list of each item that was returned to him and noted the amount each item depreciated, if at all. (Ex. 81.)  He testified that he knows the values of the items from his experience working in pawn shops.  He also stated that not all items depreciated in value.  On average, the depreciated items declined in value between 20-25%, which Burke testified is a conservative estimate.  According to Burke, the items depreciated a total of $30,756.  (Ex. 81.)

In response to Burke's depreciation estimate, Loudat opined that, instead of measuring the depreciation of each item, the correct measure would the change in fair market value of the items.  He also stated that Burke's depreciation

values are not credible because Burke provides no objective documentation to support them.

Although Loudat says it is preferable to measure the change in fair market value of each item, he nevertheless performed his own calculation using Burke's depreciation approach as a measuring tool.  Loudat determined the proper depreciation amount to be $13,320.

The Court agrees with Loudat that the better approach, rather than determining the depreciation for each item, is to measure the change in the fair market value of the items.  Under this approach, it is indeterminate whether HHPS suffered any loss due to the seizure because no evidence regarding the change in fair market value was admitted at trial.  However, the Court agrees with Burke that some of the items must have decreased in value while in HPD's custody.  Therefore, the Court accepts depreciation as a measuring tool under these circumstances and agrees with Loudat that the depreciation amount is $13,320.  Plaintiffs are therefore entitled to $13,320 in damages for items returned to them.

2.      Unreturned and Damaged Property

Plaintiffs seek $111,380 in damages, which they say represent the "fair market value of unreturned and damaged business and personal property." (Ex. 82.)  Those items include, among other things, $35,000 in cash, a $4,500

34

diamond ring Burke bought from a friend, five or six diamonds and chains valued at $12,000, another diamond valued at $7,000, stamps and DVDs worth $5,000, and checks worth $1,650.  (Id.)  Burke also asks for $7,200 for broken items that were returned to him, as well as for a damaged safe.  (Id.)

In response to Burke's estimate for unreturned and damaged property, Loudat stated that he could not provide any meaningful comment about Burke's loss estimates without additional detail about the specific items.

The only evidence before the Court concerning unreturned or damaged items comes from Burke.  Exhibit 82 is a document prepared by Burke, which lists specific items and/or categories of items that were not returned or were returned in a damaged state.  At trial, Burke also testified about the items listed in Exhibit 82.  However, absent any objective documentation that the items in Exhibit 82 existed and/or their value, the Court is left to speculate whether the items were actually seized in the first place, and whether they were in fact unreturned or damaged.

For example, in Exhibit 82, Burke seeks $35,000 for unreturned cash, which he says represents collections from car payments.  (Ex. 82.)  At trial, Burke testified that this cash was in a safe.  However, Enoka testified that he did not see that money in any safe and was unaware of it.  Burke also states that stamps,

DVDs, and baseball cards were unreturned.  However, Exhibit 353, which is a

HPD Evidence or Property Report, shows that seventeen boxes containing DVDs

were returned, as well as six boxes of games, and ten boxes of CDs.  (Ex. 353.)

Exhibit 374 shows that multiple bags, manila envelopes, folders, albums, and

boxes of albums – each filled with stamps – were returned to Burke.  (Ex. 374.)

Similarly, Exhibit 375 reveals that several boxes of sports cards were returned to

Burke.  (Ex. 375.)  In light of the evidence that such items were in fact returned to

Burke, the Court questions whether the other items in Exhibit 82 were similarly

returned.

Because there is no corroborating evidence as to the allegedly

unreturned or damaged items, the Court agrees with Loudat that additional detail

about the specific items is necessary to determine their value.  The Court finds

Burke's list of items and their values to be highly speculative.  Nevertheless, given

the sheer volume of items seized (more than 1,700 items), the lack of organization

of the returned items, and Burke's testimony, the Court finds that evidence

supports a finding that at least some items were unreturned or damaged.  The Court

therefore awards Plaintiffs ten percent of the value Burke places on the items in

Exhibit 82, for an award of $11,138.

3.      Expenses for the Closure of HHPS

With respect to damages for "expenses incurred by the closure of

Holo Holo Pawn," Loudat noted that, based on Plaintiffs' tax information, the

pawn shop incurred no expenses in 2007.  (See Plaintiffs' Brief at 53.)  This raises

the issue of whether those expenses were actually incurred.  The Court agrees with

Loudat that any expenses incurred by Plaintiffs should appear on pertinent tax

documents.  Absent any documentation of "expenses incurred by the closure of

Holo Holo Pawn," the Court rejects an award of damages for them.

4.      Plaintiffs' Private Loan

Similarly, the Court declines to award Plaintiffs $400,000 for a private

loan they "took out . . . to start Holo Holo Pawn" because no evidence was

presented at trial with respect to this loan.  (See Plaintiffs' Brief at 53.)

C.      Plaintiffs' Reputation

In Plaintiffs' Trial Brief, they ask for $1,000,000 for damages to their

reputation.  They allege that the media coverage of the search and seizure resulted

in losing their lease to the pawn shop premises, being forced to move out within

thirty days, being threatened by angry pawn shop customers, being mistreated by

people they encountered, and being forced to change their telephone numbers.

(Plaintiffs' Brief at 53-54.)  They also argue that landlords refused to lease

37

commercial property to them after the seizure because of the media coverage.  (Id. at 53.)

At trial, Burke testified that he was known as "The King of Pawn" because he operated several pawn shop businesses.  He also stated that he was on television news coverage of the search, and Kumiko confirmed that she saw him on the news.  Kumiko also testified that their landlord at the HHPS premises terminated their lease because of the news coverage and Burke's arrest.  However, neither Burke nor Kumiko testified as to threats made against them, landlords refusing to lease them commercial property after the search, or changes to their telephone numbers.

The Court finds that the news coverage of the search, the termination of the HHPS lease, and being forced to move out caused Plaintiffs' embarrassment and emotional stress, which is covered in the next section.  However, no evidence showed that their reputation was damaged, and the Court declines to award Plaintiffs for damage to their reputation.

D.    Emotional and Physical Damages

Plaintiffs ask for an award of $1,000,000 for emotional and physical damages caused by the search and seizure of the pawn shop.  (Plaintiffs' Brief at 54-55.)  In support of this amount, Plaintiffs note that Burke was admitted to

Queen's Medical Center ("Queen's") and Kuakini Medical Center ("Kuakini") in the days following the search, complaining of chest pain.  (Id. at 54.)  They also contend that Burke suffered from post-traumatic stress disorder ("PTSD") as a consequence of the search and seizure.  (Id.)

Burke testified at trial that he was emotionally injured by the August 3, 2007 search and seizure.  He stated that he has emotional stress, cannot sleep through the night, cannot sleep in the same room as his wife, and has to take medication to help with stress and sleep.  He testified that the search negatively affected his marriage because Plaintiffs argue more than they did before the search and are less intimate.  Kumiko similarly testified that Burke is always anxious and depressed and easily angered now.  Kumiko also stated that she was embarrassed from the media coverage of the search, which caused her to stop going to school.

Burke testified regarding his physical injuries caused by the search and seizure.  He stated that he had shortness of breath and chest pains after the search and that he went to Queen's and Kuakini in the days following the search. He also testified that he has sleepless nights and sweats profusely at night. Kumiko testified that, since the search, Burke screams or jumps in bed while sleeping, too.

While Burke was in police custody after being arrested at the search and seizure, he was admitted to Queen's on August 4, 2007, the day after the search.  His complaint was chest pain and he denied any shortness of breath.  Dr. Mitchel E. Rosenfeld, who tended to Burke at Queen's, noted in his report that Burke was "an unreliable historian."  (Ex. 1.)  Although Burke had been complaining of chest pain while at Queen's, he suddenly refused treatment at the hospital and "indicated he felt better, he was chest-pain-free and wished to sign out against medical advice."  (Id.)  Burke's sudden relief of chest pain occurred after he "had just been released from police custody here in the emergency department when he made this decision."  (Id.)  That Burke felt pain-free immediately after learning he was released from custody raises a question as to whether his original complaint of chest pain was genuine or whether it was an attempt to be transferred from jail to the hospital.

Further, Burke reported to the Queen's physician that he had been to the emergency department at Queen's in the past, but "there was no prior record of the patient's previous visits here."  (Id.)  Burke also reported that he had a prior myocardial infarction, but he was surprisingly "unable to name who his cardiologist is or whether or not any tests were performed."  (Id.)  Again, this raises the issue of Burke's honesty with the Queen's emergency room staff.

40

Two days later, on August 6, 2007, Burke was admitted to the emergency room at Kuakini Medical Center, complaining of substernal chest pain. (Ex. 2.)  This time, he complained for the first time of shortness of breath and an irregular heartbeat.  (Id.)  After receiving medication, Burke again signed out of the hospital "against medical advice."  (Id.)

Burke also underwent evaluation by psychologist Marvin W. Acklin, Ph.D. (Plaintiffs' expert) and psychiatrist Martin Blinder, M.D. (Defendants' expert).  Dr. Acklin met with Burke in December 2009 and his diagnostic impression of Burke was chronic PTSD and insomnia related to PTSD.  According to Dr. Acklin, Burke did not have PTSD before the August 2007 search, but did have it after the search.  Dr. Acklin therefore implies that the search caused Burke's PTSD.

Dr. Blinder conducted a psychiatric examination of Burke in January 2010.  Dr. Blinder testified as to Burke's inconsistencies, noting that Burke stated he previously had a heart attack when there were no records in support thereof and that Burke stated he had stopped smoking before the arrest while records showed he smoked until he was arrested.  At trial, Dr. Blinder explained that, because of Burke's antisocial personality disorder, Burke "may tell us the truth, but he may not."

41

Importantly, Dr. Blinder also opined that Burke's claim of PTSD is "not reliable."  He testified that Dr. Acklin's PTSD diagnosis "relies heavily on the patient's self-reports," which may not always be truthful.  Dr. Blinder also testified that Burke "endorsed all of the symptoms for PTSD," which Dr. Blinder found unusual because "you never have all of the symptoms."  After meeting with Burke, Dr. Blinder made the following conclusion about how the August 2007 search affected Burke:

> I do think he has a psychiatric disability.  I think he suffers from depression.  I think he has higher levels of anxiety now than he did before his arrest.  And while this isn't exactly a scientific term, . . . I think what you see here, diagnostically, is a shattered narcissist. . . .  After [the arrest], he was no longer able to maintain this narcissistic image of himself as a special person.  I think that is the connection that I would make between his current psychiatric symptoms of depression, social withdrawal, some sexual problems he's having, and the arrest of August 3rd.

Clearly, both experts agree that Burke suffered psychological injuries from the August 3, 2007 search and seizure.  The Court agrees with Dr. Blinder and his reasons for opining that Burke's claim of PTSD is not credible.  However, the Court finds that Burke suffers from depression, anxiety, sleep problems, and from being a "shattered narcissist."  The Court also accepts Plaintiffs' testimony that they were embarrassed by the media coverage of the search and the

42

termination of their lease.  The Court does not give great weight to Burke's visits to the Queen's and Kuakini emergency rooms, however, as he left both hospitals against medical advice and mysteriously felt better after being released from police custody.

Plaintiffs' testimony regarding emotional and physical damages reveals that they relate to (1) Burke's arrest, (2) the circumstances surrounding the arrest, and (3) HHPS's loss of business due to the seizure of all inventory. Plaintiffs do not challenge Burke's arrest as unlawful and, thus, injuries due to the arrest are not compensable.  Plaintiffs do challenge the circumstances surrounding the arrest by claiming that the SSD entry team pointed guns at Burke and threatened to shoot him.  However, as discussed above, the Court finds that no weapons were pointed at Burke during the seizure and no police officer threatened him.  Therefore, Plaintiffs are not awarded damages for injuries caused by the circumstances surrounding Burke's arrest.  With respect to HHPS's loss of business, as noted above, the Court agrees with Plaintiffs that they are entitled to economic damages caused by the unlawful seizure of HHPS inventory. Consequently, emotional and physical damages related to HHPS's loss of business after the seizure is also compensable.  The Court concludes that the City shall pay Plaintiffs $15,000 for such damages.

43

<u>CONCLUSION</u>

In light of the foregoing, judgment shall be entered in Enoka's favor on all of the Counts that proceeded to trial (Count 2 for wrongful search and seizure, Count 4 for assault, Count 6 for IIED, Count 7 for negligence, Count 8 for harassment, and Count 12 for punitive damages).  Judgment shall be entered in the City's favor on the following Counts that proceeded to trial (Count 4 for assault, Count 6 for IIED, Count 7 for negligence, and Count 8 for harassment).  Judgment shall be entered in Plaintiffs' favor on Count 2 for wrongful search and seizure against the City, and Plaintiffs shall be awarded $39,458 in damages against the City as to this claim.

DATED:  Honolulu, Hawaii, November 16, 2010.

IT IS SO ORDERED.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

<u>Kumiko Burke, et al. v. City & County of Honolulu, et al.</u>, Civ. No. 08-00339 BMK; FINDINGS OF FACT AND CONCLUSIONS OF LAW.